CHASE v. MIDDLETON.

1. TOWNSHIP BOARD OF HEALTH — ABATEMENT OF NUISANCE — RECORD OF PROCEEDINGS.

The record of the proceedings of a township board of health stated merely that a motion was made that a member of the board should serve a notice on the owners of a ditch, constructed by them to drain certain lakes, requiring them to abate the same as a nuisance, for the reason that the withdrawal of the water through the ditch, at certain seasons, left exposed a large amount of low, wet land, which, because of decaying vegetation, was dangerous to the public health. Then followed a certificate of the member directed to serve the notice, that he did personally serve the same, but showing neither what notice was served nor upon whom service was made.  The member admitted that there was no service upon one of the owners, and that the entry in the record was made subsequent to the commencement of suit by such owners to compel persons who had obstructed the ditch to remove the obstructions.  Held, that the proceedings of the board of health were irregular, and ineffectual to authorize an abatement, and afforded no protection to defendants in such suit.

2. HIGHWAYS—EASEMENT—PRESCRIPTIVE RIGHT.

    One who constructed a ditch across a highway, and used the same as a drain for more than 20 years, without objection from the township authorities, acquired a prescriptive right to such use.

3. SAME—CONDEMNATION PROCEEDINGS.

    Where, after complainant had constructed a ditch across a highway, and bridged the same, the township authorities changed the line of the highway, and built a new bridge, a proceeding, instituted many years later, to restore the highway to its original course, in which complainant was allowed a nominal sum for damages to his land, could not be relied on as a legal condemnation of his right to maintain the ditch.

4. TOWNSHIPS—LIABILITY FOR TORTS OF OFFICERS.

    A township is not liable for the torts of its officers in filling up a ditch without legal authority.

    Appeal from Kent; Grove, J.  Submitted February 8, 1900.  Decided April 24, 1900.

    Bill by Frank R. Chase and George Banks against Charles W. Middleton, executor of the estate of Edward Middleton, deceased, Albert W. Middleton, Cass T. Wright, Nathaniel Havens, and the township of Oakfield, for an injunction and other relief.  From a decree dismissing the bill, complainants appeal.  Reversed.

    *George E. & M. A. Nichols* ( *F. D. M. Davis,* of counsel), for complainants.

    *Wolcott & Ward* ( *N. O. Griswold,* of counsel), for defendants.

    HOOKER, J.  At an early day there were in Oakfield township, Kent county, five lakes, whose overflow found its way northward to the Flat river, as follows, viz.: From Horseshoe lake to Woodbeck lake; thence to Stock or Banks lake; thence to Thomas lake; thence to McClellan lake, whose outlet emptied into Black creek; which, after receiving the waters of Clear creek, emptied into Flat river; upon which, some miles below, were the

dams and mills of Edward Middleton and Cass T.
Wright. The accompanying diagram will serve to show
the relative positions of the lakes and their surroundings:

John and George Banks owned the lands between
Woodbeck lake and Thomas lake, which included Stock
or Banks lake, in the bottom of which was a bed of
marl, supposed to be valuable, but which could only be
made available by lowering the water in that lake. We
get the impression from the testimony that in ordinary
stages of the water there was little, if any, water flowing
between the three southernmost lakes, but that the Van
Winkle dam, which was located upon Black creek, below
the mouth of Clear creek, for logging purposes, set the
water back into McClellan, Thomas, and Banks lakes,
and possibly the others also. The level of Horseshoe
lake was considerably above the level of Wabasis creek,
distant a few rods south. They were separated by a ridge
of sandy land. Banks Bros. conceived the plan of cutting
a ditch through this ridge, thus making an outlet to these
lakes to the south, which would have the effect of lower-
ing Banks lake. To enable them to carry out this pro-

ject, they purchased a piece of land, extending from Horseshoe lake to the creek, upon which to dig the ditch. George Banks entered into a written agreement with all of the persons owning land bordering upon the lakes or outlets south of their own land upon Banks lake. By this agreement he promised to lower the three lakes mentioned, and in consideration thereof the other parties to the contract consented to his "lowering and drawing off the waters of said lakes, and that he should have the right to keep the same off as long as he should desire to do so, and that they would never interfere with his rights aforesaid within twenty years;" and it was also agreed that he should lower the water as soon as he could consistently, and keep the same down, at least to the common high-water mark as it existed before any dams were built on Black creek below the lakes. This agreement was dated in 1865.

Banks Bros. proceeded without delay to construct the ditch contemplated, and, to avoid any effect upon the lakes north of Banks lake, they built a dam upon their own land, across the outlet of Banks lake, which had that effect, except when cut or injured, as it was on a few occasions. At the time this ditch was dug, a highway existed upon the ridge south of Horseshoe lake, and a bridge was built by Banks Bros. over the ditch. The ditch had the expected effect upon the lakes, lowering the water several feet, and exposing the marl bed. Owing to the nature of the ground and the sharp fall, the water increased the size of the ditch, and made trouble with the bridge. Finally, it is said, an arrangement was made by which the township agreed to maintain the bridge, and ultimately it changed the line of the highway from the ridge to a point on lower ground near the lake, and erected a new bridge. It is claimed that this bridge was used more than 15 years prior to 1893, and until burned by some person or persons unknown.

Soon after this, the township authorities attempted to vacate the road near the lake, and relay it upon the ridge,

near or upon its former line, and caused the ditch to be filled; thereby practically shutting off the outlet to the south, and causing the water to rise in the lakes to its old level. John Banks thereafter sold and assigned his interest in the premises, with all rights of action, to Chase, by whom, in conjunction with George Banks, the bill in this cause was filed. The bill states that the action of the township was invalid, in so far as it attempted, either through its board of health or township board, to deprive the complainants of their right to maintain the ditch. The other defendants are mill owners upon Flat river, who are charged with conspiring and aiding in the perpetration of the alleged wrong upon the complainants. The bill prays a mandatory injunction, commanding the township to remove the obstruction to the ditch, and reconstruct the dam between Banks and Thomas lakes; and that, if more in accordance with equity, this work be ordered to be done by all of the defendants; and that an injunction issue against all, commanding them to thereafter refrain from interfering with complainants' rights in the premises. As an alternative, it was prayed that the complainants be decreed a sufficient sum to compensate them for doing such work, and that the defendants be restrained from subsequent interference. A decree was also asked against each and all defendants for the damages sustained, including loss of profits, and for general relief. Edward Middleton was made a defendant, but died pending the suit, which was revived in the name of his executor. Nathaniel Havens was the highway commissioner of the township, and participated in filling up the ditch. The defendants answered, and the case was heard, proofs being taken in open court.

The important questions appear to have been:

1. Whether Banks Bros. acquired a right to maintain their ditch.

2. Whether it was abated under proceedings by the board of health of the township, and, if so, whether those proceedings were valid.

3. Whether the filling of the ditch for the purpose of a highway was lawful, under the proceedings taken.

4. Whether the Middletons and Wright, or any of them, had anything to do with those proceedings.

5. Whether the complainants suffered any injury thereby.

The court found:

1. That the agreement between Banks and the riparian owners was a license, revocable at the end of 20 years, and that, as Banks Bros. were claiming under such license, they acquired no prescriptive right to control the waters of the lakes.

2. That practically no beneficial use of the marl beds was made by Banks Bros., except in an experimental way, from about 1871 to 1893.

3. That the alternate rising and lowering of the waters, resulting from the attempts of Banks Bros. to control them, created a public nuisance, and that the township board of health, after due notice, abated it, by filling the ditch, thereby restoring the waters of the lakes to their natural level.

4. That this was a proper and legal exercise by the board of health of their power.

5. That the damages, if any, to the complainants were inconsiderable, while the menace to the public health was great.

The bill was dismissed, with costs, and the complainants have appealed.

The testimony convinces us that the complainants have a valuable bed of marl upon their land, in proximity to the railroad, and that it is not accessible with the water at its natural level. As early as 1865 the Banks considered it worth their while to go to considerable trouble and expense to drain the bed, so as to make it feasible to excavate and use the marl. From that time until 1893 they maintained and enjoyed their right to keep the waters down. The township, if it had any rights to the contrary, did not assert them, nor does it appear that the public, or any member of it, complained that rights of navigation were affected thereby. On one occasion Mr. Middleton did assert an objection to the maintenance of

the ditch, and caused some obstructions to be placed in it, but, on the Banks requiring it, he caused them to be removed, thus recognizing the right of the Banks to maintain the ditch. This was in 1891, when the ditch had been used over 20 years. Two years later some one suddenly awoke to the realization that the public health was in danger from the "odors" which came from the lakes. A petition was circulated through the surrounding country, asking that the nuisance be abated, and the board of health of the township took steps in the matter. By a singular coincidence, the bridge across the ditch was burned about this time, and, by a still more significant coincidence, an application was made to the highway officers to take up the existing highway, and relocate it upon the ridge. Accordingly, the board of health condemned the ditch, and began to fill it up, and on the same day the highway officers, who found that the board of health had begun to fill at the exact spot to which the highway had been changed, finished the job. A bee was made, which some of the inhabitants attended, and $50, which Middleton contributed to the project, was paid into the public treasury, as shown by the township treasurer's receipt, $25 to be applied to the township fund, and $25 to the highway fund. Twenty-five dollars was expended on filling the ditch, and $25 was applied to the payment of the members of the board of health.

We are satisfied from the testimony that Mr. Middleton and other persons interested in raising the lakes had more to do with having the ditch declared a nuisance than did any well-founded or wide-spread conviction that the public was suffering from, or in danger of, an epidemic ascribable to the draining of those lakes. Many witnesses testify that the odors arising from the drained portions of the lakes were not specially noticeable, or the subject of comment; while, of those who testify to the contrary, some admit that they wanted the water raised to help their wells, to facilitate the drinking from the lakes by stock, the making of a pleasure resort for cottagers, or that the

fishing might be improved. We are convinced that there was an understanding between Middleton, the township officers, and the board of health that the latter should declare the place a nuisance, and, by the aid of some of the inhabitants, start a fill in the ditch, which should be taken up and completed by the highway officers, who were to change the line of the road for the purpose; and that Middleton contributed $50 to the enterprise, which was carried out accordingly, under the protection of a constable or deputy sheriff, who, through the unnecessary caution of the projectors of the scheme, was engaged to be present to preserve the peace, which it was expected that George Banks would otherwise break. We look upon this as a high-handed proceeding, which cannot be too severely condemned, and should not protect the parties who participated, unless the regularity of the proceedings of the board of health and highway officers compels it. This we cannot say, (1) because we find them to have been fraudulent; (2) we find neither of them regular.

The board of health was moved by a petition. This is recorded in the proceedings of the board. Then followed an entry as follows:

"Edward W. Blanchard, one of the members of the township board of health, moved that A. D. La Shell, one of said board, be instructed to serve the following notice upon George Banks and John Banks, said service to be made as soon as convenient; said notice being in words and figures as follows, to wit:

"'OAKFIELD TOWNSHIP, KENT COUNTY, MICH., June 5, 1893.
"'TO GEORGE BANKS AND JOHN BANKS:
"'You are hereby notified, as owners or occupants of the artificial drain or ditch leading from certain lakes in said township, particularly the lakes known as the 'Woodbeck Lake' and the 'Horseshoe Lake,' in said township, by which the said lakes are drained into Flat river, instead of into Black creek, where said water would naturally flow, to abate a nuisance caused along and around the margin of said lakes by the maintenance of said artificial drain; said nuisance consisting of the fluctuation of the amount of water retained in said lakes by said artificial drain partially draining the same, and leaving at certain seasons of the year a large amount of

land around the margin of said lakes, which is low, wet, and un-
wholesome, and dangerous to health, on account of decayed vegeta-
tion and the gases and unwholesome stench which arises therefrom
while the land is so temporarily exposed. The exposing of said
land to the sun, and the withdrawing of the water therefrom,
being a public nuisance, and a detriment to the public health of the
inhabitants of said township, you are therefore ordered to have said
nuisance abated by filling up said artificial drain sufficient to cause
the water to flow in its natural channel, within forty days from the
date of the service of this notice upon you.

" 'Given under our hands this 5th day of June, 1893.

" 'EDWARD H. JONES,

" 'EDWARD W. BLANCHARD,

" ' A. D. LA SHELL,

" ' H. M. HUTCHINS,

" 'Members of the Board of Health of the Town-
ship of Oakfield, Kent County, Michigan.' "

This is followed by an entry reading:

"I hereby certify that I personally served the within
notice.

"Dated this 5th day of June, 1893.

"A. D. LA SHELL."

It was admitted by La Shell, whose name is appended
to the entry, that he did not serve the notice on George
Banks, and that the entry was made after this bill was
filed. It does not show what notice was served, nor upon
whom it was served. The record contains no action upon
the petition, declaring the ditch a nuisance, and ordering
it abated, unless the motion of Blanchard, directing a
notice to be served, can be said to sufficiently show such
action.

We need not inquire whether the complainants acquired
prescriptive rights against those with whom they con-
tracted. It is evident, however, that they did, so far as
the Middletons and Wright were concerned.

As to the members of the board of health, there is no
pretense that their acts can be justified, except upon the
theory of valid action as a board or health. So, the high-
way officers can only justify upon the theory that Banks
Bros. trespassed upon the highway, or that their rights

were condemned in valid proceedings to lay out the highway. We have already said that we think both proceedings invalid for fraud, and endeavored to show how the proceedings of the board of health were inadequate. If it be said that Banks Bros. had no right to cross the highway with the ditch, there are several answers: (1) They acquired a prescriptive right by a 20-years user; (2) the township appears to have abandoned the highway in existence at the time the ditch was made, and subsequently made use of another, recognizing Banks Bros.' rights by bridging the ditch. In the last proceeding to change the highway, they profess to have condemned Banks Bros.' land for the purpose. They awarded them two dollars for the damage. They do not pretend to have condemned the right to maintain the ditch, or to have paid anything for the right to lower the lakes; relying upon the action of the board of health. We are of the opinion that all engaged in the enterprise of filling the complainants' drain, or removing the dam between Banks and Thomas lakes, were trespassers, and should be required to remove such obstructions and replace the dam. Three members of the township board were present participating, and money was received into the public treasury for, and appropriated to, the purpose. They are not parties to the record, however, and the township is not liable for the torts of its highway officers and members of the board of health, under circumstances like these. *McElroy* v. *City Council of Albany*, 65 Ga. 387 (38 Am. Rep. 791); *Wilson* v. *Mayor, etc., of Macon*, 88 Ga. 455 (14 S. E. 710); *Cooney* v. *Town of Hartland*, 95 Ill. 516; *Elmore* v. *Drainage Commissioners*, 135 Ill. 269 (25 N. E. 1010, 25 Am. St. Rep. 363); *Jolly's Adm'x* v. *City of Hawesville*, 89 Ky. 279 (12 S. W. 313); *Goddard* v. *Inhabitants of Harpswell*, 84 Me. 499 (24 Atl. 958, 30 Am. St. Rep. 373), and cases cited; *Thayer* v. *City of Boston*, 19 Pick. 511 (31 Am. Dec. 157); *Clark* v. *Inhabitants of Easton*, 146 Mass. 43 (14 N. E. 795); *Taylor* v. *Township of Avon*, 73 Mich. 604 (41 N. W.

703); *Dawson* v. *Township of Aurelius*, 49 Mich. 479 (13 N. W. 824); *Town of Chelsea* v. *Town of Washington*, 48 Vt. 610; 2 Dill. Mun. Corp. (4th Ed.) §§ 961–964, 972, 975.

The complainants may take a decree requiring the defendants Middleton and Havens, at their own expense, to remove the obstructions to the complainants' ditch, and put it in as good condition as before it was filled, and requiring defendants Middleton to replace and rebuild the dam between Banks and Thomas lakes, upon its former site, to the same height, and in as substantial a manner and condition, as it was before said dam was cut or destroyed, and that, unless said work shall be done or completed within 90 days from the filing of this decree, the complainants shall be at liberty to do and perform the same, or either thereof; in which case they shall be entitled to recover from said defendants Middleton the sum of $250 for reconstructing said dam, and from said defendants Middleton and Havens the sum of $723 for removing the obstructions to said drain. The bill will be dismissed as to defendant Wright, with costs. All other defendants will be restrained from preventing the removal of said obstructions, or in any way preventing the drainage of said lakes to the level at which they were maintained previous to the filling of said drain. The complainants will recover costs of both courts against defendants Middleton and Havens.

The other Justices concurred.